Antney **ALLFORD**, d/b/a Allford's Main Street Station and the Western Casualty & Surety Company, Petitioners,

v.

Mary E. **MURRAY** and the State Industrial Court, Respondents.

No. 41968.

Supreme Court of Oklahoma.

Dec. 27, 1966.

W. R. Bergstrasser, of Watts, Looney, Nichols & Johnson, Oklahoma City, for petitioners.

Charles V. Foor, and Stipe, Gossett & Stipe, by Clyde Stipe, McAlester, for respondents.

BLACKBIRD, Justice.

In the proceedings herein reviewed, this State's Industrial Court upheld a claim for death benefits Mary E. Murray, widow of Ray Thomas Murray, filed as claimant, alleging that her said deceased husband died by drowning on Lake Eufaula, August 1, 1965, while employed as a mechanic by Antney Allford, d/b/a Allford's Main Street Station of McAlester, Oklahoma. We will hereafter refer to her as "claimant", and to said employer and his insurance carrier, the Western Casualty & Surety Company, collectively, as "petitioner."

The principal issue before the Industrial Court, as trial court, was whether or not Murray's fatal injury arose out of, and in the course of, his employment. In its order awarding the death benefits claimed, said court specifically found and determined this issue in the affirmative.

In herein seeking vacation of the award, petitioners contend that the evidence is insufficient to support that finding.

It was stipulated at the trial that, before Murray's death, he was employed by Allford as a boat mechanic in the boat shop which the latter operated adjacent to, and in connection with, Allford's Main Street Station. The only question was whether or not Murray, while boating on Lake Eufaula, and during which he went into the water and drowned, was engaged within the scope of that employment.

According to the undisputed evidence, Allford's boat shop bought and sold both new and used boats and boat motors, and required used ones for resale. Murray both supervised repair work by other mechanics and did much of such work himself. The boat involved in the accident was one that Allford had first purchased from one Harold Knox, in December, 1964, then two weeks later, resold to one Jim Walker, and subsequently, about March 15, 1965, allowed Walker to turn back. The boat had since been kept in an old double garage building Allford used as a store room, on the back of his service station, and/or boat shop, property. According to the deposition of his 17-year-old son Jimmie, Murray had worked on the boat all of the night before the accident, and, on the day thereof, with it on a trailer attached to his own automobile, and equipped with water skis borrowed from Allford, he drove the claimant, their sons, Jimmie and William, together with their three younger children, and Jimmie's girl friend, from their home in McAlester to a recreation area near the edge of Lake Eufaula, where they all had a picnic lunch. After the lunch and putting the boat into the water, Murray took different ones of the party out in the boat on the lake at different times, and, according to the two older sons' depositions, he worked on and/or made adjustments in the boat's outboard motor at the rear of the boat, on each of these excursions. On the last of these, the boat was pulling William on water skis, when he toppled off the skis into the water. When William's head again came to the surface, he saw his father and his younger sister and brother, Barbara and Charles, out of the boat and in the water. William's deposition was to the effect that by the time he could swim to his father, and try to help rescue him and the younger children, Murray was drowned.

There was much conflicting testimony concerning varying theories as to what was the purpose of the Murray Family's trip to the lake, and of the operating of the boat on the lake, it being the theory of the respondents that both were just parts of a family outing and private mission, or project, having no connection whatsoever with Allford's boat business. The testimony and depositions of the claimant and the only two of the couple's children (Jimmie and William) who were interrogated, however, were to the effect that it was a part of Murray's employment to test and adjust boat motors on the lake, that he

had often done this, and that that was what he had been doing when he, in some manner, fell, or was thrown, into the water and drowned. A portion of the claimant's testimony was as follows:

"Q * * * was it a part of his (the deceased) job to service boats after hours and on Sundays.

"A Yes sir.

* * * * * *

"Q Can you tell the Court what the occasion was for your husband going to the lake on this particular day was?

"A Well he was going to check out the boat, and see how it run, they knew nothing about the boat, it was one that had been treated (traded).

* * * * * *

"Q When you got to the lake what did you do?

"A Well we had a picnic lunch and then he let the children go with him in the boat, where he could test it, check it out and see what was wrong.

* * * * * *"

The testimony of the respondent Allford was to the effect that the involved boat was in perfect condition, that he had not instructed the deceased to do any work on it, and that it did not need any done on it. In one portion of his testimony, this witness indicated that there was an element of estrangement between Murray, and claimant, and he explained Murray's use of the boat on the day of his death by stating that he lent it to him, at Murray's request, after said employee had told him, in substance, that he needed it for an outing with his family to promote a reconciliation. At one place in his testimony, the witness left the inference that it was not necessary to take boats out on a lake to test their motors, as his boat shop had a 5-barrel water tank in it that was used for testing boat motors "if there was work to be done on them." When this witness was asked what days Murray worked for him, he stated that he worked six days a week and was "off" on Sunday.

He further testified, in substance, that his boat customers always brought their boats to his shop when they needed repairing, and that: "We don't make calls on the lake to work on boats." When asked if he had "ever sent Ray out to test a motor on the lake", the witness described two instances, however, when the shop had sold boats, and/or motors, that Ray had taken out on the lake to test; but Allford maintained that these were the only jobs " * * * that we have done outside the station on boats— * * *". Mr. Allford further testified that it had been almost a year (before the accident) since Ray Murray had worked for him on Sunday; and that, about a month before, Murray had purchased a tachometer for respondent's boat shop that was used to test boat motors. The undisputed evidence was that this instrument was found in respondent's shop a few days after the accident, but that there were a few small tools found in the death boat, when it was brought to shore. Allford's testimony was to the effect that these little tools came with the boat, and he left the inference that they had been in it all the time that it had been in the shop's store room.

We think it obvious from the above description of the evidence introduced on behalf of the claimant that it tends to show, that, at the time of Ray Murray's drowning he was engaged on a mission serving the interests of his employer Allford, owner of the boat he was operating, and that to the extent reflected was engaged in the course of his employment. We agree with the cases cited by petitioners to the effect that the burden is upon the claimant, in a case like the present one, to prove that the employee died from an accidental injury in the course of his employment, that this cannot be done on a speculative basis, but must be shown by competent evidence, and that, where there is no positive evidence to show it, recovery will be denied; but, after a thorough examination of the record in this case, we cannot agree that there was no competent evidence

here reasonably tending to show that Ray Murray's death resulted from an injury he received in the course of his employment. Although we recognize that some of the testimony introduced on behalf of respondents strongly tends to conflict with the testimony introduced on behalf of the claimant, it was the prerogative of the Industrial Court to resolve this conflict. In Platner v. Bill Moore Chevrolet, Okl., 400 P.2d 148 (syll. 2) we held:

"Whether an injury to an employee, resulting in his death, arose out of and in the course of employment is a question of fact to be determined by the State Industrial Court from proof adduced in particular proceeding, and its finding thereon will not be disturbed on review when supported by competent evidence."

And, in Kier v. Burton, Okl., 385 P.2d 989, this court held:

"1. The State Industrial Court is the sole judge of the credibility of witnesses, be they lay or expert, who appear before it, and of the weight and value to be accorded to their testimony.

\* \* \* \* \* \*

"3. The question of whether an injury arose out of employment may be resolved from circumstantial evidence which does not arise to that degree of certainty as to preclude reasonable men from drawing opposite inferences."

Respondents do not contend that any of the evidence introduced on behalf of the claimant, and referred to above, is incompetent, and since, as we have indicated, there was clearly a dispute as to the facts pertaining to the issue, their contention citing a statement from Pool Well Servicing Co. v. Morris, Okl., 389 P.2d 981, 982, that the controversial issue, here is a question of law, is inapplicable.

In accord with the foregoing, the award to the claimant is hereby sustained.

HALLEY, C. J., JACKSON, V. C. J., and DAVISON, WILLIAMS, IRWIN, BERRY and LAVENDER, JJ., concur.