WKY TELEVISION SYSTEM, INC., and Reliance Insurance Company, its Insurance Carrier, Petitioners,

v.

Henry Jack CLAY, Deceased, Jewel Dean, Guardian of Mary Louise Clay, Widow, Respondents, and the State Industrial Court of the State of Oklahoma.

No. 42907.

Supreme Court of Oklahoma.

March 18, 1969.

Donald N. Bykerk, Oklahoma City, for petitioners.

Carl E. Moslander, Oklahoma City, for respondents, Mary Louise Clay, widow, and another.

BLACKBIRD, Justice:

This is an original proceeding for the review of the State Industrial Court's award of death benefits under the Workmen's Compensation Law to the guardians of the widow and children of Henry Jack Clay, deceased, on account of the latter's drowning in June, 1967, while an employee of the petitioner WKY Television System, Inc., hereinafter referred to by its designation in said court as "respondent".

At the time of his death, said employee, who was sixty-four years old, had been employed by respondent for 15 years, during the last 5 years of which he had done manual labor on a tract of land of about 80 acres, where respondent's television station is located, in northeastern Oklahoma City. On said tract respondent also has a green house and more than one lake, or water reservoir. The water from the lakes is

used in irrigation and the growing of cattle. The lake, in which Clay drowned, was referred to as the "West lake", and is about thirty yards from a pump house containing a power driven pump used in distributing the lake water in the irrigation. Although this lake had not been generally used for swimming, it had been open to fishing, but the latter had been discontinued three or four years before Clay's drowning, except, by special permission, certain newspaper carrier boys had been allowed, when accompanied by an adult supervisor, to come upon the property and fish in the lake.

A fishing "derby", duly authorized and supervised, had occurred there a few days before Clay's drowning, and a rod and reel, with a fishing line, equipped with a bobber on it, had presumably been left in or near the lake by a person attending the derby. When, on the day of his fatal accident, Clay had been directed by his superior, a Mr. Adkins (who was in charge of Clay's work and that of another employee, Tom Coburn) to go to the pump house and start the pump motor, for the purpose of irrigating that day, he was unsuccessful in starting the motor and caused Coburn, who had accompanied him, to summon Adkins to the pump house to see if he could get the motor started. While Adkins was in the pump house trying to start the motor, Clay went outside and was sitting on the lake bank, when he saw the aforementioned bobber floating on the surface of the lake, about 40 yards from the bank. Clay then decided to retrieve the bobber, and the rod and reel thought to be attached to it, so informed Adkins, and waded out into the lake for that purpose. The record reflects that Clay told Adkins that he was going to get the bobber and attachments "for the man it belonged to." When he found that the lake was too deep, where the bobber was, to wade to it, he returned to the bank, removed his trousers, and swam out to it. After reaching the bobber, he started to swim with it to the opposite bank (which was nearer than the one he had left) but then sank and appeared to be drowning. Adkins' son, who had driven to the property and was visiting with his father at the time, pulled Clay out of the lake. Clay, who was apparently unconscious, was then placed in the son's automobile, and driven first to a fire station for artificial respiration and then to a hospital, but he never revived.

At the trial, the principal issue was whether Clay's fatal injury arose out of, and in the course of, his employment. In entering its order for the aforementioned award, the trial tribunal specifically found that it did; and said order was affirmed on appeal to the Industrial Court en banc. The collective term "respondents", as hereafter used, will include the respondent's insurance carrier, Reliance Insurance Company.

The substance of respondents' argument for vacation of the subject award is that, at the time of Clay's accidental drowning, he was engaged in no task, or duty, that benefited his employer, or, for which he was hired; and that said accident was not the result of any incident related to the performance of any such task, or duty.

To support the first part of respondents' argument, they rely on certain excerpts from the testimony of Mr. Adkins (the sole witness as to how the accident occurred) which they would have us interpret as showing that Clay drowned after his usual working hours of 8 A.M., to 5 P.M. From a careful examination of Adkins' testimony as a whole, it is our opinion that it does not unequivocally support the conclusion that the accident occurred after 5 P.M., and that Clay was then off duty. As to the time of day it happened, we think the only reasonable conclusion to be reached from the whole body of this testimony is that Adkins was "not sure" (as he acknowledged) but that he thought Clay's drowning occurred "Right around 5 o'clock". As to whether Clay was off duty for the day when he was sitting on the lake bank and happened to see the bobber in the water, Adkins testified that "His day was done", and further testified, in substance, that as soon as Tom Coburn reported to the witness (presumably in or near the green

house) that Clay had been unable to start the pump motor, Coburn's work day was over, and Coburn left the job, or premises. From other testimony Adkins gave, however, it could reasonably be inferred that Clay was expected to wait, and see if Adkins could get the motor started, before he was free to leave; that Clay's work day did not always end at 5 P.M.; and that he was paid for overtime when he was there after that hour.

As to whether the project in which Clay was engaged at the time he drowned—namely, attempting to recover the fishing equipment from the lake—was related to his performance of any task for the benefit of his employer, or for which he was employed, respondents say that (as set forth in their statement of the facts) Clay's duties "were primarily that of a laborer involved in taking care of the shrubbery and grass, keeping the grounds clean, doing some irrigation, including stringing pipe, and on the day in question of starting the pump, but never in salvaging material from the lake, and neither he nor anyone else had ever been instructed to do so."

While Mr. Adkins' testimony reasonably bears out the first part of this statement, this witness also testified that he was responsible for "taking care of the grounds" (as well as running the green house) and that Clay's job (in addition to helping mow the grass) was " * * * whatever came up to be done." Following this, and Adkins' testimony that he was Clay's supervisor, he also testified, in substance, that he determined "what was to be done * *"; and he admitted that, when Clay told him he was going into the lake to get the fishing gear out of it, he (Adkins) made no objection. We think it may be reasonably inferred from Adkins' testimony, that it was his desire that Clay remove those articles from the lake. And, since the particular tasks Clay performed, and the hours he worked, in assisting Adkins in discharging his responsibilities for the custodial "care of the grounds" appeared, from Adkins' testimony, to have depended entirely upon his individual wishes, or decisions, we cannot say

that the task Clay was engaged in, at the time he drowned, was not incidental to such responsibilities, or that his fatal injury was not a natural incident to his work, upon consideration of its broad scope. In our opinion this conclusion is in conformity with the criteria laid down in Stanolind Pipe Line Co. v. Davis, 173 Okl. 190, 47 P.2d 163, and Folsum Auto Supply v. Bristow, Okl., 275 P.2d 706, quoted by respondents.

We recognize that the evidence indicated that the fishing rod and reel and bobber belonged to no one in the posture of a superior, or employer, to whom Clay owed any *direct* duty, but, under the circumstances, we cannot say that it was not beneficial to Clay's employer—at least in the mind of Clay's superior, Adkins, who was responsible for the care of the grounds —to have that paraphernalia removed from the lake. Here, as in Allford v. Murray, Okl., 421 P.2d 822, we cannot agree that there was no competent evidence reasonably tending to show the employee's death resulted from an injury he received in the course of his employment. Claimant's proof on that feature of the case, depended solely on the testimony of Adkins, who, in recognition of his position with the employer, was interrogated, and referred to by claimant's attorney as a "hostile witness". His testimony was, in many respects, conflicting and ambiguous; but, as we recognized in the Allford case, supra, the State Industrial Court is the sole judge of the weight and value to be accorded such testimony. As that court specifically found that Clay's death resulted from "an accidental personal injury, arising out of and in the course of" his employment, and cannot say that said finding is without competent evidence reasonably tending to support it, said court's order and award are hereby sustained.

IRWIN, C. J., BERRY, V. C. J., and DAVISON, WILLIAMS, JACKSON and LAVENDER, JJ., concur.

HODGES and McINERNEY, JJ., dissent.